**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

BRIAN O. BEIER,                          )
    Plaintiff,                    )
           )
  v.                                          )  CAUSE NO.: 2:12-CV-53-PRC
           )
CAROLYN W. COLVIN,                      )
Commissioner of the Social Security      )
Administration,                          )
    Defendant.                    )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Brian O. Beier on February 3, 2012, and Plaintiff's Social Security Memorandum [DE 16], filed by Plaintiff on June 28, 2012. Plaintiff requests that the April 20, 2011 decision of the Administrative Law Judge to deny him disability insurance benefits and supplemental security income be reversed or, alternatively, remanded for further proceedings. On August 9, 2012, the Commissioner filed a response, and on August 23, 2012, Plaintiff filed a reply. For the reasons set forth below, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On April 13, 2010, Plaintiff filed applications seeking disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 423, 1381. In both applications, Plaintiff alleged disability beginning October 29, 2004. Plaintiff's claims were denied initially on June 23, 2010, and upon reconsideration on September 23, 2010. Thereafter, Plaintiff filed a written request for a hearing on October 1, 2010. A hearing was held on April 8, 2011, before Administrative Law Judge ("ALJ") Edward P. Studzinski, at which Plaintiff, his attorney, and vocational expert ("VE") Thomas A. Gusloff appeared.

1

On May 18, 2011, the ALJ issued a decision denying Plaintiff's applications.  The ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2007.

2.  The claimant has not engaged in substantial gainful activity since October 29, 2004, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, history of right shoulder injury, coronary artery disease with history of triple bypass surgery and obesity (20 C.F.R. 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except: the claimant is unable to climb ladders, ropes or scaffolds, is able to occasionally climb ramps and stairs, balance stoop, kneel, crouch or crawl and is unable to perform overhead reaching with dominant right arm.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.  The claimant was born on [ ], 1965 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (20 C.F.R. 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 29, 2004, through the date of this decision (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969 (a)).

R. 15-25.

Plaintiff sought review of the ALJ's decision. However, on December 15, 2011, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision the final decision of the Commissioner.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Background

Plaintiff was born in 1965 and was thirty-nine years old on the alleged disability onset date of October 29, 2004. Plaintiff was enrolled in special education courses for the "mildly mentally handicapped" and graduated with a high-school education. At some point near or in 1983, Plaintiff had a Stanford-Binet IQ of 73. Plaintiff's past relevant work consisted of a tractor-trailer driver and an unsuccessful attempt as a bulldozer operator.

### B. Medical Evidence

On October 28, 2004, Plaintiff was admitted to the hospital by Dr. Orfanos, Plaintiff's cardiologist, with a history of hypertension, substernal discomfort, generalized tiredness, and

3

exertional dyspnea.  Plaintiff's stress test was abnormal, and he was admitted to the hospital for a cardiac catheterization and coronary angiogram.  The angiogram demonstrated a totally occluded right coronary artery with severe stenosis of the left anterior descending artery and circumflex artery.  On October 29, 2004, Plaintiff underwent triple coronary bypass surgery with a LIMA to the mid LAD artery, aorta to the proximal LAD artery, saphenous vein bypass graft, aorta to the obtuse marginal branch of the circumflex artery, and saphenous vein bypass.  Plaintiff received the necessary prescriptions and was discharged in stable condition on November 2, 2004.

On May 11, 2005, Plaintiff underwent a treadmill stress echocardiogram after experiencing left upper extremity discomfort, which nitroglycerin resolved.  The echocardiogram was deemed negative.  Plaintiff sought further treatment on May 26, 2005, after feeling chest and left arm discomfort.  Plaintiff was diagnosed with left arm pain, likely musculoskeletal; coronary artery disease, post bypass; hypertension; and hypercholesterolemia.

On November 14, 2005, Dr. Hile noted medical costs as a concern in the treatment of Plaintiff's coronary artery disease, hypertension, hyperlipidemia, and thyroid disorder.  Dr. Hile changed Plaintiff's medications in addition to providing Plaintiff with samples.

Todd Snyder, Psy.D, completed a consultative examination report dated February 20, 2006. Dr. Snyder tested Plaintiff on the Wechsler Adult Intelligence Scale ("WAIS-III").  Dr. Snyder reported that Plaintiff was cooperative and "his effort on tasks was very good."  R. 265.  Plaintiff's WAIS-III score of 97 for Perceptual Reasoning skills falls within the 42nd  percentile; this was Plaintiff's highest score.  Plaintiff received a Verbal Comprehension Index score of 67 and Verbal IQ score of 69, which fell within the one and two percentiles respectively.  Plaintiff's Performance IQ score was 87, and his Full Scale IQ score was 76.  Because of the discrepancy between Plaintiff's highest and lowest scores, Dr. Snyder opined that Plaintiff's "Full Scale IQ score is not a good

4

overall representation of Mr. Beier's intellectual abilities . . . [and] can be best understood by considering the verbal and perceptual skills separately."  AR 266.

Based on the WAIS-III results, Dr. Snyder reported that Plaintiff has significant deficits in verbal comprehension skills and low-average working memory abilities and processing speed, which "[t]ogether . . . put claimant at a significant disadvantage for tasks requiring rapid processing, or mental manipulation of verbal information."  *Id*.  Further, Dr. Snyder found that Plaintiff "appears to have adequate judgment and experience to manage his own funds without supervision."  *Id*.  However, he found that Plaintiff has intellectual disadvantages for tasks requiring verbal comprehension or acquisition of "crystalized knowledge" that would make "gainful employment difficult . . . but not impossible given his average spatial reasoning skills, good social skills, and adequate self-care skills."  AR 267.

On October 19, 2006, Dr. Hile noted Plaintiff's difficulty obtaining medications due to cost.  Plaintiff had sought treatment with Dr. Hile because of chest pressure, left arm pain, and shortness of breath with exertion in the previous months.  Plaintiff complained of becoming dyspneic when he attempted to work on his car.  Dr. Hile noted that Plaintiff "is quite obviously having angina and at his age obviously this does need to be pursued."  AR 612.  Subsequently, Plaintiff was admitted for an evaluation due to abnormal EKG with a mild ST segment depression in the left precordial leads, new minor T wave changes, such that a previous inferior wall infarction could not be excluded.  Dr. Orfanos did not recommend stress testing due to his concerns over unstable angina-type symptoms.  R. 277.  A left heart catheterization indicated intermediate coronary syndrome, coronary artery disease, and hypertension.  However, the grafts proved patent, although Plaintiff's left anterior descending artery was totally occluded, the circumflex coronary artery was probably totally occluded at one branch, and the dominant right coronary artery was totally occluded with a

long lesion.  Dr. Orfanos opined that in comparison to the 2004 angiogram, the distal right coronary artery was the same, explaining that Plaintiff was "not a good candidate for any type of percutaneous coronary intervention in view of the very long nature of the lesion and the fact that it is severe and likely total as well with bridging collaterals."  AR 283.  When considering the results and Plaintiff's stability and toleration of condition, Dr. Orfanos recommended no further intervention.

On January 24, 2008, Plaintiff presented to both Dr. Orfanos and Dr. Hile with atypical left arm discomfort and chest tightening.  Dr. Orfanos had not treated Plaintiff since the 2006 visit due to cost.  Plaintiff received an evaluation and a nuclear stress test.  Plaintiff walked on the treadmill for a little over seven minutes but calf pain prevented Plaintiff from continuing.  Plaintiff was prescribed Metoprolol, Lisinopril, Levothyroxine, and Vytorin.

On December 1, 2008, Plaintiff again sought urgent care due to worsening chest discomfort. R. 375.  Dr. Orfanos opined it was "possible that his symptoms may be in part due to the known un-bypassed right with severe diffuse subtotal to total disease which is well collateralized, and not felt to be amenable to intervention."   AR 379.   Cardiac catheterization was again performed, demonstrating mildly elevated blood pressure, mild irregularities of the large left main trunk, total occlusion of the proximal left anterior descending artery, circumflex artery with an occlusion and mild irregularities, subtotal to total long occlusion of the distal right coronary artery with eighty percent mid right stenosis with right collaterals in the bypassed left anterior descending, moderately to severely diseased midportion of the proximal left descending vein, mild irregularities and moderate disease of the left descending artery, and trace to mild mitral insufficiency associated with premature ventricular contractions.  Plaintiff was diagnosed with intermediate coronary syndrome, hypertension, and hypercholesterolemia.

On February 12, 2009, Plaintiff complained of shoulder pain; no pathology was found.  Dr. Hile provided Plaintiff with an injection for bursitis.  On November 30, 2009, Plaintiff saw Dr. Hile with multiple problems, including lower back pain.  A lumbar spine MRI completed on December 2, 2009, revealed a left paracentral disc herniation at L5-S1 abutting and displacing the left S1 nerve root.

On January 28, 2010, Plaintiff saw Dr. Hile for nausea, dizziness, and shortness of breath.  Dr. Hile noted the latter problems were always present due to Plaintiff's heart and lung disease.  Plaintiff was also noted to have cholecystitis.

An April 13, 2010, a carotid duplex study indicated antegrade flow in the vertebral arteries, but no significant obstructive lesions in the extracranial carotid system.  On May 3, 2010, Dr. Kansal noted that Plaintiff was able to participate in a stress treadmill test and exercised for eight minutes and twenty seconds with a normal evaluation.  Plaintiff also reported his headaches and dizziness had resolved since Isosorbide was discontinued.  Dr. Kansal encouraged Plaintiff to exercise and lose weight.  A May 31, 2010 right shoulder X-ray was negative for acute injury, but confirmed postsurgical acromioplasty changes.

On June 9, 2010, Dr. Smejkal examined Plaintiff at the Commissioner's request.  Dr. Smejkal noted Plaintiff's BMI of 32, lumbar spinous and paraspinal tenderness, pain and tenderness of the right shoulder with decreased range of motion, and abnormal grip strength on the right.

On June 18, 2010, non-examining State agency physician, J. Sands, M.D., opined that Plaintiff was able to perform light exertional activity with no use of ropes, ladders, and scaffolds and with occasional postural limitations.  Dr. Sands noted that no examining source statements appeared in the file for review.

On June 22, 2010, non-examining State agency psychologist, Dr. Ken Lovko, found Plaintiff's mental impairment nonsevere due to Plaintiff's history of employment, independent living, and ability to drive. Dr. Lovko considered Plaintiff's functional limitation in the area of concentration, persistence, or pace to be "mild." AR 517. Dr. Lovko based his medical opinion on Listing 12.02 for Organic Disorders and found that Plaintiff did not meet the Listing's requirements. All other mental impairments in the 12.00 Listings were left unmarked and without further notation.

On July 17, 2010, Plaintiff sought care after experiencing chest pain. The EKG was abnormal with Q waves in the inferior leads and an indication of a prior inferior infarct, but there was no acute process. On August 12, 2010, Dr. Hile completed a medical source statement indicating that Plaintiff was unable to lift five pounds or more due to his shoulder, back, and cardiac problems. Dr. Hile opined that Plaintiff is limited to thirty minutes of standing, sitting, and walking due to Plaintiff's disc and cardiac disease. Dr. Hile opined that Plaintiff "should be on disability-lung [diagnosis], chronic shoulder pain, back impairment and angina prevent him from working." AR 629. Dr. Kansal also completed a medical source statement on August 18, 2010, indicating similar limitations due to disc herniation, nerve impingement, shoulder surgery, and bypass surgery.

## C. Plaintiff's Testimony

Plaintiff testified that he completed the 12th grade. He is single and lives alone. Plaintiff's normal day consists of sitting at home, watching television, or driving to his parents' homes roughly two blocks away. Otherwise, Plaintiff testified, "Pretty much I'm home all the time." AR 62. Plaintiff's girlfriend completes most of his household chores.

When asked about his literacy, Plaintiff testified that he can read very few things but is able to read his name "because I have done it so long and stuff. [But] if I don't spell my address out a lot I'll forget how to spell Schneider and stuff." AR 44. Plaintiff mostly refers to his driver's license

to recall his street address. Plaintiff testified, "I have had the Post Office Box for so long I just know it. It's in the back of my head. This is because I know it." AR 45-46. Plaintiff testified that he cannot read street signs and gets lost frequently. Plaintiff testified that he does not write notes for himself like grocery lists or on calenders. However, Plaintiff stated that he has less difficulty reading dates and numbers. Plaintiff explained that he usually puts the doctor's card on the refrigerator as a reminder of an appointment date. However, Plaintiff testified that he usually asks his dad, mom, girlfriend, or sister because "they pretty much help me out." AR 46. Plaintiff further stated that his girlfriend or family members do remind him of appointments since they usually drive him.

As to his past work, Plaintiff testified that a majority of the work was as a truck driver. Plaintiff testified that, although he went on the same route every day as a truck driver, he would get lost frequently and have to call for step-by step directions. Moreover, Plaintiff stated that he crashed his semi-truck in 2001, which is how he injured his shoulder.

The VE asked if Plaintiff had to lift, load, or unload the truck to which Plaintiff responded, "Unload." AR 76. Further, Plaintiff testified that as a bulldozer operator, workers had to check the oil which required taking off a panel that Plaintiff guessed weighed 30 lbs. Plaintiff estimated lifting roughly 50 lbs at the truck jobs. When the ALJ asked why Plaintiff did not return to work as a truck driver, Plaintiff stated, "Because the doctor told me, with my shoulder taking part of my bone out of my shoulder, that climbing up and down would tear out, only thing that's holding my shoulder up is the muscles, he told me." AR 50. Plaintiff testified that he is unable to work "because of my reading and my back and my shoulder." AR 51. Plaintiff explained that he mostly uses his left hand and that his left arm is getting stronger.

9

When asked further about his sporadic treatment history, Plaintiff explained that he "could not afford to go to the doctor." AR 56. Plaintiff testified that his worker's compensation stopped, but when Plaintiff received HIP insurance in 2009, he was able to seek treatment. Although Plaintiff could afford pain medications in 2009, the medications did not help Plaintiff's numbness in his left leg. Plaintiff's leg goes numb after standing for more than twenty minutes. Further, if Plaintiff attempted to walk more than half of a block, Plaintiff would get out of breath and his leg would go numb. Plaintiff stated that the numbness is a result of his herniated disk. Moreover, Plaintiff testified that he does not like to take pain medication because of the risks of addiction; thus, Plaintiff usually goes home to sit or lie down to get the numbness to go away.

### D. Vocational Expert Testimony

The VE testified that Plaintiff's past relevant work was precluded based on the provided limitations. The ALJ first described a hypothetical individual that can lift a maximum of 20 lbs occasionally and 10 lbs frequently and can stand and walk six out of eight hours in an eight-hour workday. The individual also has postural limitations such as the inability to climb ladders, ropes, or scaffolds. The hypothetical individual can only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, as well as reach overhead with his dominant right hand. The VE testified that an individual as described would be limited to light and unskilled positions such as a cafeteria attendant (8,000 jobs locally); a folding machine operator (2,000 jobs locally); and a stuffer for textiles (3,000 jobs locally). The jobs remained unaffected if the individual were further limited to no overhead reaching with the dominant hand. However, the VE explained that neither the Dictionary of Occupational Titles nor selected characteristics of occupations specifically addressed that type of reaching limitation, and one would need to review the specific job demands.

When considering an individual that is further limited to lifting only 2 lbs with the dominant hand and 20 lbs with the other, the VE testified, "I would think that would limit the . . . light unskilled jobs that I identified . . . . Sedentary would be the safest way to go." AR 82, 83. The VE testified that at the light level with limited used of the upper extremities is the job of school bus monitor (1,000 jobs locally), which would require a higher reading level. The VE identified available sedentary jobs as a stuffer (toy and sporting equipment) (1,000 jobs locally); assembler (3,000 jobs locally); and a preparer of plated products (2,000 jobs locally).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's

11

findings are supported by substantial evidence and under the correct legal standard.  *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).  If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings."  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits."  *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).  The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  To be found disabled, the claimant's impairment must not only prevent him from

doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite his limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving Steps One through Four, whereas the burden at Step Five

is on the ALJ. *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff contends that the ALJ committed reversible error by improperly evaluating Plaintiff's credibility; by rejecting the opinions of the treating physicians; and by finding his borderline intellectual functioning to be a non-severe impairment, resulting in errors at Steps Two, Three, and Five of the sequential analysis. The Commissioner responds that the ALJ decision was proper and supported by substantial evidence. The Court considers each of Plaintiff's arguments in turn.

### A.  Credibility

Plaintiff argues that the ALJ erred in rejecting Plaintiff's statements concerning his impairments and limitations as not credible with regard to (1) the status of his cardiac disease; (2) his mental limitations; and (3) his ability to lift. The Commissioner contends that the credibility finding is particularly lengthy and not patently wrong so as to justify remand.

In making a disability determination, Social Security Regulations provide that the Commissioner must consider a claimant's statement about his symptoms, such as pain, and how the claimant's symptoms affect his daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a); 416.929(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id*. In determining whether a statement of pain contributes to a finding of disability, the Regulations set forth a two-part test: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms; and (2) once an ALJ has found an impairment

14

that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id.*

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

    (1)    The individual's daily activities;
    (2)    Location, duration, frequency, and intensity of pain or other symptoms;
    (3)    Precipitating and aggravating factors;
    (4)    Type, dosage, effectiveness, and side effects of any medication;
    (5)    Treatment, other than medication, for relief of pain or other symptoms;
    (6)    Other measures taken to relieve pain or other symptoms;
    (7)    Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996).

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states he is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on the claimant's ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p at *6. An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overtured unless the claimant can show that the finding is "patently wrong." *Prochaska v. Barnhard*, 454 F.3d 731, 738 (7th Cir. 2006). Overall, the ALJ "must build a logical bridge from evidence to conclusion." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

In the present case, the ALJ provides a somewhat lengthy explanation as to why he found Plaintiff "less than fully credible." The ALJ begins his analysis with the boilerplate language: "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." AR 19. Without more, such boilerplate language may fail to build the logical bridge for the Court to uphold the credibility determination. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). However, the ALJ goes on to discuss the objective record used to determine Plaintiff's credibility; thus, the use of the boilerplate language in this instance does not, by itself, warrant remand.

First, the ALJ discussed the objective evidence of Plaintiff's cardiac status that he considered before concluding that Plaintiff was "essentially normal from a cardiac standpoint [and] has good exercise tolerance on treadmill tests." AR 20. The ALJ proceeded to discuss the medical record for Plaintiff's triple coronary bypass surgery in 2004 and two subsequent visits to St. Anthony Medical Center in May 2005 and October 2006. The ALJ found significant that "[Plaintiff]'s cardiologists did not describe him as disabled, and his intermittent treatment history is inconsistent with Plaintiff's claim of continuous disability since October 2004." R. 20. Specifically, the ALJ stated that these findings did not corroborate Plaintiff's allegations of ongoing shortness of breath and chest pain. The ALJ discussed Plaintiff's treatment due to left upper arm pain and chest pain in January and December 2008 and the subsequent evaluation for coronary insufficiency and ischemia in April 2010.

The Court finds the ALJ's logic regarding Plaintiff's credibility from a cardiac standpoint flawed for a number of reasons. First, the ALJ improperly considered the absence of a finding of

disability by a cardiologist as reflecting negatively on Plaintiff's credibility. The absence of such a statement does not constitute substantial evidence in support of the ALJ's finding that Plaintiff is not disabled because the issue of whether or not a claimant is disabled is an administrative question reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *see also* SSR 96-5p, 1996 WL 374183 (July 2, 1996) ("Medical Source Opinions on Issues Reserved to the Commissioner"). Given that a statement from a doctor that Plaintiff *is* disabled would not be binding on the ALJ, it is curious that the ALJ would rely on the absence of a statement of disability as proof that Plaintiff *is not* disabled.

Second, the ALJ's omissions pertaining to Plaintiff's "intermittent" treatment history are troubling. Before an ALJ may find that an intermittent treatment history or a claimant's refusal to follow a treatment plan undermines the claimant's credibility, "an ALJ must first explore the claimant's reasons for the lack of medical care." *Shauger*, 675 F.3d at 696 (citing SSR 96-7p, 1996 WL 374186, at *7); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)). The ALJ may need to inquire whether there are good reasons, such as the inability to afford treatment, for the sporadic treatment history by asking the claimant at the hearing. *Id*. (citing SSR 96-7p, 1996 WL 374186, at *7-8). In the present case, the financial burden of Plaintiff's treatments is cited on numerous documents in the record to explain the gaps in treatment. For example, due to cost, Dr. Hile changed Plaintiff's medication and provided him with samples on November 14, 2005, and again October 19, 2006. Dr. Orfanos also noted that cost posed a problem for Plaintiff. At the hearing, the ALJ asked Plaintiff about his intermittent treatment history to which Plaintiff responded that, after his worker's compensation income terminated, he could not afford treatment until he received HIP insurance. The ALJ fails to discuss any of this evidence.

Finally, the ALJ's reasoning is internally inconsistent in that the ALJ states that the record does not corroborate Plaintiff's allegation of ongoing shortness of breath and chest pain, when,

immediately following that conclusion, the ALJ himself cites Plaintiff's complaints of chest pain to his treating physicians. Because the ALJ fails to discuss the numerous, favorable treatment records in support of Plaintiff's ongoing allegations, the ALJ has not built a logical bridge between the evidence and his decision.

Next, Plaintiff argues that the ALJ erred in rejecting Plaintiff's statements regarding his mental functioning, questioning the ALJ's reliance on Plaintiff's grades of As and Bs in special education classes to find him not credible. The Court agrees. As argued by Plaintiff and not discussed by the Commissioner, special education courses have different academic standards and do not equate to general academic high school courses. Plaintiff's records show that he received not only As and Bs, but Cs and Ds as well. Moreover, the ALJ appears to credit Plaintiff's testimony that his literacy was the reason why he left his job as a bulldozer operator, when in fact it was not only his literacy but also his shoulder pain. The ALJ may not pick and choose favorable evidence when it suits the ruling. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Diaz*, 55 F.3d at 307. Without discussion of this favorable evidence, the ALJ has not properly considered the objective record in its entirety as to Plaintiff's mental functioning.

As for his ability to lift, Plaintiff argues that the ALJ erred by finding Plaintiff "less than fully credible." The ALJ noted the objective record pertaining to Plaintiff's degenerative disc disease of the lumbar spine, acknowledging his diagnosis of left sciatica in December 2009. Regarding Plaintiff's right shoulder injury, the ALJ examined Plaintiff's allegations of shoulder pain in February 2009 and May 2010, noting that the examinations and x-rays were normal. This record evidence led the ALJ to conclude that Plaintiff "only has some pain, tenderness and a slightly reduced range of motion in his right shoulder." AR 20. The ALJ also found significant that "Plaintiff testified that his right shoulder is supported only by muscles and tendons" given that the

ALJ found that the x-rays proved to be "essentially normal" and that there is no evidence of Plaintiff's right clavicle being surgically removed.  The ALJ's credibility determination as to Plaintiff's ability to lift is flawed because his reasoning is based on an overly literal understanding of Plaintiff's statements at trial.

For example, the court in *Mendez v. Barnhart*, 439 F.3d 360 (7th Cir. 2006), confronted a similar issue and explained:

> The administrative law judge's finding that Mendez was not "particularly credible," whatever exactly that means, is undermined by his literalism. When a person says that she sleeps all day, she doesn't mean it literally; she means that she is abnormally sleepy and listless and dozes off frequently.  That is what one expects of someone with severe depression.

*Id*. at 363.  As in *Mendez*, the ALJ in this case took Plaintiff's statements too literally when Plaintiff's lack of clarity at the hearing and literal answers appear consistent with Plaintiff's mental impairments.

Moreover, the treatment records from Plaintiff's May 2010 visit to St. Anthony Medical Center, evidence that the ALJ himself referenced in the credibility determination, notes that Plaintiff's X-ray of his right shoulder revealed evidence of Plaintiff's acromioplasty, a surgery which involves removing or shaving the bone for serious rotator cuff injuries.  Although the Court respects the deferential treatment given to an ALJ's credibility determination, the Court is granted more freedom to overturn such a determination if the ALJ based his credibility findings on objective and reviewable factors, rather than subjective allegations.  *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford*, 227 F.3d at 872); *see also Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (finding that the review court is not bound by a credibility determination "if the finding is based on errors of fact or logic").

The ALJ concludes his credibility determination by combining Plaintiff's education record, "lengthy work history of performing semi-skilled labor," and unsuccessful attempt to return to work as a bulldozer operator as sufficient to conclude that Plaintiff is less than fully credible. Regarding Plaintiff's unsuccessful work attempt, the ALJ reasons that "[d]espite the fact that he was unsuccessful in this attempt, the fact that he tried to return to medium-heavy work suggests that he could have performed work at a less demanding exertional level." AR 21. However, Plaintiff testified that the exposure to salt, the reading requirements, *and* the status of his shoulder post-surgery were the reasons the attempt at work was unsuccessful. Attempts at work, especially unsuccessful attempts, are not necessarily inconsistent with a finding of disability. *Shauger*, 675 F.3d at 697 (citing *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)). The ALJ's logic is again internally inconsistent because the ALJ found that Plaintiff could not perform any past relevant work.

The ALJ also placed undue emphasis on the fact that Plaintiff worked on his car and helped his brother move a drum. Specifically, the ALJ finds that the fact that Plaintiff "performed strenuous activities during the alleged period of disability . . . suggests that his symptoms are not as severe as alleged." AR 21. Plaintiff contends that the ALJ neglected to mention and ignored the evidence that Plaintiff reported dyspnea after attempting to work on his car or that Plaintiff was injured from trying to help his brother. Furthermore, the record is silent as to what type of work Plaintiff even attempted on his car (e.g. oil change verses something heavier). The ALJ did not fully explore this testimony before using it to discredit Plaintiff.

For the foregoing reasons, the ALJ failed to build a logical bridge from the evidence and testimony to his credibility determination, and remand for a proper credibility determination is warranted.

### B. Weight Accorded to Treating Physician Medical Assessments

Plaintiff argues that the ALJ erred by according no weight to the opinions expressed by treating physicians Dr. Hile and Dr. Kansal on a Medical Assessment of Ability to do Work-Related Activities form ("Medical Assessment Form") and by instead adopting the opinion of non-examining physician Dr. Sands. The Commissioner responds that the ALJ reasonably concluded that the treating source opinions were given for purposes of obtaining benefits and were so similar so as to raise questions regarding the doctors' credibility.

Regarding the nature and severity of a claimant's condition, treating physicians are given controlling weight when the physicians' opinions are supported by medical findings and consistent with the record. *See* 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Gudgel*, 345 F.3d at 470). However, the ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503 (citations omitted). "[A] contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470 (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)). When the ALJ does not give the treating physician's opinion controlling weight, the ALJ applies the following facts in evaluating the opinion:

(1)     length of treatment;
(2)     the nature and extent of the treating relationship;

(3)      to what extent the treating physician based his opinion on evidence such as medical
         signs and laboratory findings;
(4)      how consistent the treating physician's opinion is with the record; and
(5)      whether the treating physician is a specialist and any other relevant factors.

*See* 20 C.F.R. § 404.1527(d)(2). "An ALJ may not select and discuss only that evidence that favors

his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to

allow the appellate court to trace the path of his reasoning." *See Diaz*, 55 F.3d at 307 (citing

*Herron*, 19 F.3d 329, 333 (7th Cir. 1994); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.1993)) (per

curiam). "An ALJ's failure to consider an entire line of evidence falls below the minimal level of

articulation required." *Id*.

In the present case, the ALJ provided a substantial analysis in support of his determination

that the opinions of treating physicians Dr. Hile and Dr. Kansal, as expressed by each on the Medical

Assessment Form, were "extreme." The ALJ reasoned that the identical opinions regarding

Plaintiff's limitations lacked any findings, explanation, or conclusions despite the doctors' different

specialities and that the two doctors' own medical records failed to reveal such severe restrictions.

The ALJ concluded that the assessments were based primarily on Plaintiff's subjective allegations,

noting that neither doctor had indicated such restrictive limitations in the treatment records until

requested to fill out the form for the purpose of the disability claim. As a result of these findings,

the ALJ accorded each opinion no weight.

Dr. Hile, Plaintiff's treating physician, completed the Medical Assessment Form on August

12, 2010. Dr. Hile opined that Plaintiff is unable to lift five pounds or more, both occasionally and

frequently, is only able to stand, walk, and sit less than thirty minutes, and requires more than two

periods of rest in a reclining position of more than one hour each during an eight hour workday. Dr.

Hile further found that Plaintiff cannot climb, balance, stoop, crouch, kneel, crawl, bend, or twist

and that Plaintiff is restricted to limited exposure to heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity, and vibrations. Dr. Hile concluded that the limitations qualify Plaintiff for disability.

After providing the details of Dr. Hile's assessment, the ALJ found that the limitations imposed by Dr. Hile were not supported by the record as a whole and accorded no weight to Dr. Hile's assessment. First, the ALJ reasoned that Dr. Hile's opinion is inconsistent with his own records. For example, Dr. Hile supported Plaintiff in an effort to renew his Commercial Driver's License in September 2009. Second, the ALJ noted that, in the records for Plaintiff's most recent visit to Dr. Hile in January 2010, Plaintiff complained only of dizziness and nausea with no mention of back or shoulder pain. The ALJ observed that Plaintiff had not undergone any treatment for the herniated disc, that imaging of his shoulder was normal, and that the symptoms in his shoulder are not as severe as alleged. As to the restrictions on walking, sitting, standing, and performing postural activity as well as the requirement that Plaintiff recline during the day, the ALJ found no evidence in the record to support those limitations. The ALJ concluded that Dr. Hile's assessment was based largely on Plaintiff's subjective allegations as it reflects Plaintiff's history rather than any clinical or diagnostic findings and was expressed not in the course of treatment but rather for purposes of obtaining disability benefits.

On August 18, 2010, Dr. Kansal, Plaintiff's cardiologist, also completed a Medical Assessment Form, and he assigned restrictions identical to those in Dr. Hile's assessment. The ALJ discussed Dr. Kansal's assessment, first finding that Plaintiff has been "essentially normal" from a cardiac standpoint since undergoing triple bypass surgery in 2004. This is the one finding by the ALJ that the Court finds not supported by substantial evidence. Plaintiff correctly notes that, although his bypasses were functioning, he still had additional and inoperable blockages, and that,

while he was stable, his condition cannot be described as "normal." Nevertheless, this mischaracterization of Plaintiff's cardiac condition does not change the overall appropriateness of the weight given to Dr. Kansal's assessment by the ALJ. The ALJ notes Dr. Kansal's acknowledgment that his assessment is based largely upon Plaintiff's subjective allegations and that Dr. Kansal's assessment is nearly identical to that of Dr. Hile. The ALJ found this curious given that Dr. Kansal and Dr. Hile have different specialities yet their findings were not specific to their areas of specialty.

In his conclusion, the ALJ reasons that neither Dr. Hile nor Dr. Kansal provide any similar restrictions in their treatment notes until Plaintiff requested the assessment for the purposes of his disability claims. Plaintiff argues that the ALJ erred in rejecting the treating source assessments on the basis that the opinions were obtained "by the claimant's representative for the purposes of disability." If this had been the only reason given, remand may be appropriate. However, this was one among many reasons given by the ALJ in a thorough analysis as set forth above.

Finally, in his briefs to the Court, Plaintiff has not identified treatment records or medical opinions consistent with the extreme limitations set forth in the two assessments. Accordingly, the Court finds that the ALJ more than minimally articulated his analysis of the evidence so that the Court can follow his reasoning on the weight given to the opinions of the treating physician on the Medical Assessment Forms. *See Skarbek*, 390 F.3d at 503; *see also* 20 C.F.R. § 404.1527(d)(2).

Plaintiff also contends that the ALJ erred by according great weight to the opinion of non-examining physician Dr. Sands in the Physical Residual Functional Capacity Assessment he completed on June 18, 2010. In his assessment, Dr. Sands noted that no examining source statements appeared in his file for review. Thus, the ALJ erred in giving greater weight to Dr.

24

Sands, a non-examining consultant, when his review was not based on a complete case record. *See* SSR 96-6p, 1996 WL 374180, *3 (July 2, 1996). Accordingly, remand on this issue is proper.

### C.  Mental Impairments–Listing 12.05

Plaintiff argues that the ALJ erroneously found Plaintiff's borderline intellectual functioning to be a non-severe impairment, resulting in errors at Steps Two, Three, and Five of the sequential analysis. The Commissioner contends that the ALJ justifiably found that Plaintiff did not meet the criteria for Listing 12.05C because Plaintiff was not diagnosed with mental retardation and, therefore, lacked the requisite adaptive functioning deficits to satisfy the diagnostic description for Listing 12.05. The Court addresses Plaintiff's arguments pertaining to Listing 12.05 in turn.

*1.    Step Two*

At Step Two, the ALJ considers whether the claimant has an impairment or combination of impairments that are severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). Plaintiff argues that the ALJ erred at Step Two by finding Plaintiff's borderline intellectual functioning non-severe.

In the present case, based on Plaintiff's history of semi-skilled work, the ALJ found that borderline intellectual functioning did not cause more than a minimal limitation on Plaintiff's ability to perform unskilled work. In determining the severity of Plaintiff's mental impairment, the ALJ considered the four functional areas, or Paragraph B criteria, and found only a mild limitation in the functional area of concentration, persistence, or pace. This determination led the ALJ to conclude that Plaintiff's impairment was non-severe. *See* 20 C.F.R. § 404.1520a(d)(2), 20 C.F.R. Pt. 404 Subpt. P, Appendix 1, §12.00 *et seq* (providing that, if the ALJ rates the degree of limitation in the areas of daily living, social functioning, and concentration, persistence, or pace as "none" or "mild"

25

and no episodes of decompensation, the mental impairment is considered non-severe). The ALJ relied on Plaintiff's testimony, Plaintiff's answers on the Function Report he filled out in May 2010, and the opinion of Dr. Lovko, the psychological consultant who completed a Psychiatric Review Technique Form on July 22, 2010, and found Plaintiff's borderline intellectual functioning to be "nonsevere."

Any failure by the ALJ to identify borderline intellectual functioning as severe is harmless error in this case. At Step Two, the ALJ found that Plaintiff has the severe impairments of degenerative disc disease of the lumbar spine, history of right shoulder injury, coronary artery disease with history of triple bypass surgery, and obesity, and the ALJ went on to consider whether Plaintiff met Listing 12.05 for Mental Retardation at Step Three of the analysis. *See Rinehart-Banaszak v. Comm'r of Soc. Sec.*, Cause No. 3:11-CV-12, 2011 WL 6826428, at *8 (N.D. Ind. Dec. 28, 2011) (recognizing that an ALJ's failure to designate an impairment as severe is harmless error when "the ALJ finds other severe impairments and continues with the five-step evaluation process"); *Raines v. Astrue*, No. 06-CV-0472, 2007 WL 1455890, *7 (S.D. Ind. Apr. 23, 2007) ("As long as the ALJ proceeds beyond step two . . . no error could result solely from his failure to label an impairment as 'severe.' . . . . What matters is that the ALJ considers the impact of all of the claimant's impairments–severe and non-severe–on his ability to work."); *Street v. Barnhart*, 340 F. Supp. 2d 1289, 1293-94 (M.D. Ala. 2004) (explaining that the ALJ's failure to list low IQ as severe impairment was harmless error when the ALJ referred to the claimant's "borderline intellectual functioning" in his decision and considered plaintiff's "severe and not severe impairments" in combination in subsequent analysis).

26

*2.      Step Three*

At Step 3 of the disability evaluation process, the ALJ determines whether a claimant's impairments meet or equal the criteria of a Listing of Impairments, and, if they do, the claimant will be found disabled. 20 C.F.R. § 416.920(a)(4)(iii).  An individual suffering from an impairment that meets the description of a listing or its equivalent is conclusively presumed to be disabled.  *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).  In order "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  An impairment that manifests only some of the criteria will not qualify, no matter its severity.  *Id*.  The claimant "bears the burden of proving his condition meets or equals a listed impairment."  *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (citing *Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir. 1993); *Anderson v. Sullivan*, 925 F.2d 220, 223 (7th Cir. 1991); *Steward v. Bowen*, 858 F.2d 1295, 1297 n.2 (7th Cir. 1988)).  Nevertheless, "[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing *Brindisi ex rel. Brindisi*, 315 F.3d at 786); *see also Scott*, 297 F.3d at 595-96. The ALJ's decision need not discuss every piece of evidence offered in the record.  *See Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citing *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)).  However, a failure to evaluate evidence that supports a claim provides little assurance that the ALJ adequately considered the claimant's case.  *Id*.

Despite finding Plaintiff's mental impairment not severe at Step Two, the ALJ considered the requirements set forth in Listing 12.05 for Mental Retardation because of Plaintiff's history of learning impairments.  Listing 12.05 for Mental Retardation provides, in relevant part:

27

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . .

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C.  Plaintiff asserts that he should be evaluated under Paragraph C because of his Verbal IQ score of 69 and his severe physical impairments.

The prerequisite to satisfying Listing 12.05 is establishing the diagnostic description set forth in the introductory paragraph that the claimant have "deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A (providing that the "structure for the listing for mental retardation is different from the other mental disorders listings" because the listing is satisfied if the claimant satisfies the diagnostic description and any one of the four sets of criteria); *Wiszowaty v. Astrue*, 861 F. Supp. 2d 924, 939 (N.D. Ind. 2012).  The Court finds that the ALJ made several errors in his Step Three analysis of Plaintiff's mental impairment.

First, the ALJ concluded that "[t]he record does not document the existence of adaptive deficits manifested during the developmental period, as is necessary to establish mental retardation."  AR 18.  However, the record indeed contains sufficient documentation regarding Plaintiff's education prior to age twenty-two, his enrollment in special education classes, and the poor grades he received in those classes.  Moreover, at the hearing, the ALJ briefly inquired about Plaintiff's

special education, suggesting that the ALJ was aware of this relevant evidence. Nevertheless, the ALJ does not discuss Plaintiff's educational history at Step Three. The ALJ erred by not addressing the evidence of special education services when evaluating whether there is evidence of adaptive deficits and impaired functioning prior to age twenty-two. *See Bixler v. Astrue*, 734 F Supp. 2d 601, 605-06 (S.D. Ind. 2010) (requiring remand for the ALJ's failure to discuss evidence that Plaintiff was in special education classes at a young age or to consider Listing 12.05 despite claimant's attorney requesting that the Listing be considered); *see also Ribaudo*, 458 F.3d at 584 (finding significant that the ALJ left contrary evidence unaddressed and holding that the ALJ may provide limited explanation only in situations where the record is consistent); *see also King v. Barnhart*, 1:06-CV-381, 2007 WL 968746, *3 (S.D. Ind. Feb. 26, 2007) (finding significant that the claimant was enrolled in special education classes prior to age 22 with no indication of post developmental age deterioration in mental abilities or injuries in adulthood that would cause mental deficits) (citing *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006)). On remand, the Court directs the ALJ to consider the record pertaining to Plaintiff's adaptive deficits prior to age twenty-two.

Second, the ALJ found Plaintiff's history of performing semi-skilled work and other activities and relationships to be inconsistent with adaptive deficits indicative of mental retardation. However, the relevant time period for the manifestation of adaptive functioning is prior to age twenty-two, and the ALJ does not discuss whether any of this work history occurred prior to age 22 or what Plaintiff's adaptive deficits were prior to that age. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. Moreover, "[t]he agency may not rely upon previous work history to prove non-disability where the claimant meets the Listings. If the rule were otherwise, it would seriously penalize claimants who have tried to work despite their handicap, a situation contrary to the intent of Congress." *See* Social Security Disability Law & Procedure in Federal Court § 5:46. Although the

29

ALJ used Plaintiff's history of semi-skilled work to minimize his adaptive deficits, the ALJ failed to address favorable evidence demonstrating that Plaintiff had difficulty performing those semi-skilled jobs due to his mental difficulties and not solely because of his difficulty reading. Plaintiff testified that, as a truck driver, his employers would show him on a map how to get places, even though he went to the same place every time. He would nevertheless get lost and call for step-by-step directions.

Finally, the ALJ placed too much emphasis on the absence of an official diagnosis of mental retardation. Although the ALJ acknowledges that such a diagnosis is not required to meet Listing 12.05, the ALJ suggests that the "lack of any such diagnosis supports the decision that [Plaintiff] is not, in fact, mentally retarded." AR 18. It is possible for a claimant to meet the listing for "mental retardation" with a clinical diagnosis of borderline intellectual functioning based on an IQ between 60 and 70 when the individual meets the requirements of the opening paragraph of 12.05 and has a "physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C. Plaintiff's Verbal IQ of 69 brings him within 12.00C,[1] and the ALJ found that he suffers from several severe impairments.[2] Thus, it is not the clinical diagnosis but rather whether the claimant satisfies the listing requirements that dictates whether Listing 12.05 is met. *See King*, 2007 WL 968746, at \*3.

---

[1] 20 C.F.R. Pt. 404 Subpt. P Appendix 1 § 12.00D(6)(c) ("In cases where more than one IQ is customarily derived from the test administered, e.g. where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest in conjunction with 12.05.").

[2] Although not discussed by the ALJ or the parties, it appears that Plaintiff meets the requirement of having a "physical or other mental impairment imposing an additional and significant work-related limitation of function." A finding of a "severe" impairment at Step Two equates with a finding of an "additional and significant limitation of function" at Step Three, and, in this case, the ALJ found that Plaintiff has several severe impairments. *See King v. Barnhart*, 1:06-CV-381, 2007 WL 968746, \*3 (S.D. Ind. Feb. 26, 2007).

Also, there is no medical opinion regarding whether Plaintiff's mental impairment met or equaled the Listing 12.05C criteria.  Because Dr. Lovko found Plaintiff's borderline intellectual functioning to be not severe, he evaluated Plaintiff's mental impairment under Listing 12.02 and not under Listing 12.05.  *See Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (citing 20 C.F.R. § 494.1526(b) ("Medical equivalence must be based on medical findings . . . .  We will consider the medical opinion given by one or more medical or psychological consultants designated by the Commissioner in deciding medical equivalence.")).

For the foregoing reasons, the Court remands this matter for a proper analysis of whether Plaintiff meets the requirements of Listing 12.05 at Step Three.

3.      *RFC determination and Step Five determination*

Plaintiff argues that the ALJ erred by not including Plaintiff's mental impairments in both the RFC and the hypotheticals posed to the VE at Step Five.   The Court considers each in turn.

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments.  20 C.F.R. § 416.945(a).  The determination of a claimant's RFC is a legal decision rather than a medical one.  20 C.F.R. § 416.927(e)(2); *Diaz*, 55 F.3d at 306 n.2.  The RFC is an issue at Steps Four and Five of the sequential evaluation process.  SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996).  "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  *Id*.  The ALJ's RFC finding must be supported by substantial evidence.  *Clifford*, 227 F.3d at 870.  In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p at *5.  In addition, he "must consider limitations and restrictions imposed by all of an individual's

impairments, even those that are not 'severe'" because they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id.*

The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the additional limitations of being unable to climb ladders, ropes, or scaffolds; only occasionally able to climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; and unable to perform overhead reaching with the dominant right hand.  The ALJ concluded that the medical evidence did not support more extensive limitations.

Plaintiff argues that Dr. Snyder, to whom the ALJ gave great weight, found that Plaintiff had significant disadvantages and mental limitations but that the ALJ considered Plaintiff's reading and writing test scores only to be mental limitations and did not include any mental limitations in the RFC.  The ALJ gave great weight to Dr. Snyder's opinions, including his opinion that Plaintiff is at a significant disadvantage for tasks requiring rapid processing or mental manipulation of verbal information.  The ALJ noted that Dr. Snyder opined that these disadvantages would make gainful employment difficult but not impossible due to his average spatial reasoning skills, good social skills, and adequate self-care skills.  As a result, the ALJ found that these limitations did not preclude Plaintiff from performing unskilled work.  Significantly for purposes of this motion, Plaintiff does not contest this finding.

The ALJ must include all the claimant's limitations in the hypotheticals presented to the VE. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical.").  Even when there are gaps in the hypotheticals, courts may assume that the VE has familiarized himself with the particular limitations of the claimant when the record suggests that the VE heard testimony on the limitations or that the VE

reviewed the medical evidence in the record.  *Id*.  As in *O'Connor*, the ALJ presented the VE in this case with a series of increasingly restrictive hypotheticals, which undermines the assumption that the VE is considering the entire record rather than focusing on the precise hypotheticals being posed. *See id*.

Nevertheless, although the ALJ erred by not including any mental limitation in the formal RFC or in the hypotheticals posed to the VE, the error is harmless because the positions identified by the VE were unskilled positions.  Again, Plaintiff does not contest the ALJ's finding that the Plaintiff's mental limitations identified by Dr. Snyder were accommodated by unskilled work.  Thus, remand on this issue alone is not warranted.  However, because this matter is being remanded for other reasons, the ALJ on remand shall include, if appropriate, all mental limitations in the RFC as well as in the hypotheticals posed to the VE, including but not limited to his difficulties reading, his academic limitations, and his significant disadvantage for tasks requiring rapid processing or mental manipulation of verbal information.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** Plaintiff's Social Security Memorandum [DE 16] and **REMANDS** the ALJ's decision pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this Order.

SO ORDERED this 18th day of March, 2013.

s/ Paul R. Cherry_____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record